**Marcy A. FAHNESTOCK, Andrew T. Lints and Thomas Lints, Plaintiffs,**

v.

**William B. REEDER, deceased, by and through William E. Haggerty as Administrator of the Estate of William B. Reeder, Defendant.**

**No. CIV.A. 00–CV–1912.**

United States District Court, E.D. Pennsylvania.

April 5, 2002.

Melvin H. Hess, Anita J. Hanna, Gibbel, Kraybill & Hess, Lancaster, PA, Samuel M. Mecum, Lancaster, PA, for Marcy A. Fahnestock, Andrew T. Lints.

Gary Francis Seitz, Palmer Biezup & Henderson, Philadelphia, PA, for Thomas Lints.

Joseph B. Mayers, Lisa G. Faden, Mayers, Mennies & Sherr LLP, Blue Bell, PA, for William B. Reeder, David Glenlast, Sondra L. Reeder.

### OPINION AND ORDER

VAN ANTWERPEN, District Judge.

Plaintiffs Marcy Fahnestock, Thomas Lints and Andrew Lints filed suit against William Reeder on April 12, 2000 to recover for personal injuries arising from a recreational boating accident. The incident involved boats piloted by Plaintiff Thomas Lints and Defendant William Reeder on the Susquehanna River between the Holtwood and Safe Harbor dams on May 31, 1998. Thomas Lints was not directly injured in the accident, but alleged negligent infliction of emotional distress resulting from having witnessed his son, Plaintiff Andrew Lints, being injured.

On August 17, 2000, Defendant William Reeder, deceased, by and through William Haggerty as Administrator of Reeder's Estate (hereafter, "Reeder"), responded to the initial complaint, filing a Counter Claim against Thomas Lints (hereafter, "Lints"). Reeder's Counter Claim alleges that Lints caused or contributed to the accident by tortious operation of his boat. We resolved a number of issues concerning the underlying complaint and dismissed Plaintiffs' claims against several additional defendants in our October 3, 2001 opinion and order responding to summary judgment motions by all defendants. *Smith v. Haggerty*, 169 F.Supp.2d 376 (E.D.Pa. 2001).[1]

On January 28, 2002 we rejected Lints' counter-claim defense counsel's motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), invoking stare decisis, in that all courts considering the matter have followed *Pennsylvania Water & Power Co. v. Federal Power Commission*, 123 F.2d 155, 158–161 (D.C.Cir.1941), finding the Susquehanna River navigable at or near Holtwood, Pennsylvania. Lints' defense counsel neglected even to mention this precedent in their original brief accompanying their 12(b)(1) motion.

Moving for reconsideration, Lints' counter-claim defense counsel now gives thorough consideration to *Pennsylvania Water & Power Co.* and argues that the decision's declaration of the Susquehanna's navigability is relevant only to congressional authority under the Commerce Clause—not our court's original jurisdiction under the Admiralty Clause.[2] We find this reasoning persuasive, grant the motion for reconsideration, vacate our January 28, 2002 order and our October 3, 2001, published decision in *Smith v. Haggerty*, and grant the Rule 12(b)(1) motion to dismiss. We also dismiss without discussion any and all other motions and matters before us in this case, because we have no jurisdiction to consider them. To our knowledge, we hold for the first time that the Susquehanna River is not wholly navigable for the purpose of conferring admiralty jurisdiction, limiting navigability in admiralty to bodies of water that are actually navigable or susceptible to being navigated without modification from their current state.

## DISCUSSION

### I. The Motion's Appropriateness

Though no party to this case had previously raised the arguments now be-

1. Wayne Scott Smith, an additional plaintiff in this case, petitioned to withdraw his complaint on November 1, 2001, and we issued our order granting his petition on the same date.

2. Movants have not contended that we lack subject matter jurisdiction under the "nexus test" for determining admiralty jurisdiction, which requires that "[t]he type of incident ... [be] likely to disrupt commercial activity," and that there be "a substantial relationship between the activity giving rise to the incident and traditional maritime activity." *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 2896–97, 111 L.Ed.2d 292 (1990). However, we may consider jurisdictional arguments of our own accord at any time, whether or not the parties assert them. *In re: Orthopedic "Bone Screw" Products Liability Litigation*, 132 F.3d 152, 155 (3rd Cir.1997).

Despite the seemingly stringent language in *Sisson*, "an unbroken chain of Supreme Court precedents indicates that most, if not all, accidents involving pleasure boats are properly heard in admiralty." John F. Baughman, "Balancing Commerce, History, and Geography: Defining the Navigable Waters of the United States," 90 Mich.L.Rev. 1028, 1029 (1992). It is likely that we would maintain jurisdiction over this matter based on the type of accident—if the accident had occurred on "navigable waters" within our admiralty jurisdiction.

fore us concerning our subject matter jurisdiction, Fed.R.Civ.P. Rule 12(h)(3) requires dismissal of an action at any stage of the proceedings—even after a jury trial—if subject matter jurisdiction is shown to be lacking. *Meritcare Inc. v. St. Paul Mercury Insurance Co.*, 166 F.3d 214, 217 (3rd Cir.1999). In other words, Rule 12(b)(1) motions may be filed at any time and repeatedly, if the movants assert new arguments warranting our attention. *Mortensen v. First Federal Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir.1977). Lints' motion is appropriate.

II. Defining the Term "Navigable"

In *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 407–408, 61 S.Ct. 291, 85 L.Ed. 243 (1940), the Supreme Court set forth a landmark definition of navigability:

> A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken.... When once found to be navigable, a waterway remains so. This is no more indefinite than a rule of navigability ... based upon 'useful interstate commerce' or 'general and common usefulness for purposes of trade and commerce' if these are interpreted as barring improvements. Nor is it necessary that the improvements should be actually completed or even authorized. The power of Congress over commerce is not to be hampered because of the necessity for reasonable improvements to make an interstate waterway available for traffic.

Thus, under *Appalachian Electric Power Co.*, a river was deemed navigable if it had a history of navigability and/or any potential for navigability.

In 1941, following *Appalachian Electric Power Co.*, the D.C. Circuit thoroughly considered the Susquehanna River's navigability at and near Holtwood, Pennsylvania for the purpose of conferring subject matter jurisdiction. *Pennsylvania Water & Power Co.*, 123 F.2d at 158–161. Tracing the history of the river's navigability beginning in the 17th century and continuing through the construction of the Holtwood dam, the court observed that "for a long time past, [it] has [not] carried any interstate commerce in navigation, and ... there is no present need of improvements with the object of making the river usable for interstate navigation." Nonetheless, the court concluded, based on the Susquehanna River's history and potential, "[W]e have no hesitation in declaring the Susquehanna a navigable water of the United States." *Id.* at 161.

Since *Pennsylvania Water & Power Co.*, every federal court which has considered cases arising from actions on the Susquehanna River, including the Third Circuit in *Metropolitan Edison Co. v. Federal Power Commission*, 169 F.2d 719, 720 n.1 (3rd Cir.1948), has treated the river as navigable, applying the D.C. Circuit's decision. *See*, e.g., *Federal Energy Regulatory Commission v. Keck*, 818 F.Supp. 792, 795 FN5 (W.D.Pa.1993) ("[W]e believe there is sufficient precedent to readily conclude that the Susquehanna is a navigable river.").

The Lints' defense counsel now argues, and we agree, that the waters of the Susquehanna River between the Safe Harbor and Holtwood dams *are* "navigable waters of the United States" within the purview of Congress under the Commerce Clause, but *are not* "navigable waters," for the purpose of conferring admiralty jurisdiction upon our court. Plaintiff Fahnestock contends that the "Lints' argument begs the question: why *should* there be a difference between 'navigability' for purpose A (Commerce Clause) and purpose B (exercise of admiralty jurisdiction)?"

Fahnestock answers her own question: "[T]he U.S. Supreme Court in *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) identified . . . four separate usages of the word 'navigability' depending on the context." Fahnestock Brief at p. 5. However, Fahnestock wrongly contends that the Supreme Court did not "endors[e] the wisdom" of separate definitions of the term "navigable." *Id.* In fact, as Lints' defense counsel argues, *Kaiser Aetna,* and virtually all decisions after it, have said that we must apply different meanings of the term to different contexts, though they may be, as Fahnestock contends, "definition[s] of the word 'navigable' which only lawyers could love." *Id.* at 3.

In *Kaiser Aetna,* the Court found that the owners of a marina, Kuapa Pond, could deny public access to it unless they were justly compensated by the government, though the marina was dredged and connected by a bay to the Pacific Ocean. *Kaiser Aetna,* 444 U.S. at 164, 100 S.Ct. 383. The Court's decision concerned the boundaries of a navigational servitude and the Takings Clause. In so deciding, however, the Court set forth what have since been the guidelines to employing the term "navigability:"

It is true that Kuapa Pond may fit within definitions of "navigability" articulated in past decisions of this Court. But it must be recognized that the concept of navigability in these decisions was used for purposes other than to delimit the boundaries of the navigational servitude: for example, to define the scope of Congress' regulatory authority under the Interstate Commerce Clause, *see,* e. g., *United States v. Appalachian Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); *South Carolina v. Georgia,* 93 U.S. 4, 3 Otto 4, 23 L.Ed. 782 (1876). ; *The Montello,* 87 U.S. 430, 20 Wall. 430, 22 L.Ed. 391 (1874); *The Daniel Ball,* 10 Wall. 557, 19 L.E. 999 (1871), to

determine the extent of the authority of the Corps of Engineers under the Rivers and Harbors Appropriation Act of 1899, and to establish the limits of the jurisdiction of federal courts conferred by Art. III, § 2, of the United States Constitution over admiralty and maritime cases. Although the Government is clearly correct in maintaining that the now dredged Kuapa Pond falls within the definition of "navigable waters" as this Court has used that term in delimiting the boundaries of Congress' regulatory authority under the Commerce Clause, *see,* e.g., *The Daniel Ball, supra,* 10 Wall., at 563, 19 L.Ed. 999; *The Montello, supra,* 87 U.S. 430, 20 Wall. at 441–442, 22 L.Ed. 391; *United States v. Appalachian Power Co., supra,* 311 U.S. at 407–408, 61 S.Ct. at 299–300, this Court has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation. Thus, while Kuapa Pond may be subject to regulation by the Corps of Engineers, acting under the authority delegated it by Congress in the Rivers and Harbors Appropriation Act, it does not follow that the pond is also subject to a public right of access. *Kaiser Aetna,* 444 U.S. at 171–173, 100 S.Ct. 383.

Kualpa Pond was navigable under the Commerce Clause, but not navigable for the purpose of defining a navigational servitude outside the protections afforded by the Takings Clause. Likewise, the portion of the Susquehanna River entirely enclosed by dams is navigable under the Commerce Clause, but not navigable for the purpose of conferring admiralty jurisdiction. The *Kaiser Aetna* court noted in its footnotes that under the Commerce Clause,

Navigable waters of the United States are those waters that are subject to the

ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity. *Id.* at 171–172 FN6, citing 33 CFR § 329.4 (1978).

Thus, though the incident at issue occurred on the Susquehanna between the Safe Harbor and Holtwood dams, the river is immutably navigable under the Commerce Clause, because these dams could one day be breached, or locks or bypasses could be built, once again enabling interstate shipping traffic to traverse its full length.

Long ago, the Supreme Court held that District Courts' jurisdiction over the nation's waterways falls under the admiralty power, not the Commerce Clause. *See The Propeller Genesee Chief v. Fitzhugh,* 53 U.S. 443, 13 L.Ed. 1058, 12 How. 443 (1851); *see also The Belfast,* 74 U.S. 624, 640, 19 L.Ed. 266, 7 Wall. 624 (1868), citing *Genesee Chief,* 53 U.S. at 452, 53 U.S. 443 ("Difficulties attend every attempt to define the exact limits of admiralty jurisdiction, but it cannot be made to depend upon the power of Congress to regulate commerce, as conferred in the Constitution. They are entirely distinct things, having no necessary connection with one another, and are conferred, in the Constitution, by separate and distinct grants.").

The *Kaiser Aetna* court further interpreted *Genesee Chief,* stating, " 'Navigable water' subject to federal admiralty jurisdiction was defined as including waters that are navigable in fact." *Kaiser Aetna,* 444 U.S. at 172, 100 S.Ct. 383 FN7. Though the phrase "navigability in fact" has been subject to extensive debate before and since *Kaiser Aetna,* it clearly distinguishes the judicial admiralty standards from the congressional jurisdictional standards, which include immutable navigability and susceptibility to navigability with any improvements.

In *Oseredzuk v. Warner Company,* 354 F.Supp. 453, 456 (E.D.Pa.1972), *aff'd* 485 F.2d 680 (3rd Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974), the court rejected a "rationale of navigability based on possible future improvements." The court explained:

> We are of the opinion that admiralty jurisdiction must be determined at the time of the loss and that the concept of future interstate navigability propounded in *Appalachian Electric Power Co., supra,* relates only to the exercise of Congressional regulatory power under the Commerce Clause and not to the scope of the federal courts' powers pursuant to the grant of admiralty jurisdiction. *Id.*

The Third Circuit affirmed *Oseredzuk,* providing further support for its position in *United States v. Stoeco Homes, Inc.,* 498 F.2d 597, 610 (3rd Cir.1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975). In *Stoeco Homes,* the Third Circuit explained that *Genesee Chief* "redefined navigable waters, for purposes of admiralty jurisdiction, as dependent upon the actual navigable character of the water. . . . The well known definition in *The Daniel Ball,* 77 U.S. 557, 10 Wall. 557, 19 L.Ed. 999 (1870) is derived from *The Genesee Chief.*" *Stoeco Homes,* 498 F.2d at 610. The Third Circuit cited the relevant passage of *The Daniel Ball:* "Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary

modes of trade and travel on water." *Stoeco Homes,* 498 F.2d at 609–610, citing *The Daniel Ball,* 77 U.S. at 563, 10 Wall. 557.

Thus, *Stoeco inter alia* resurrected *The Daniel Ball*'s "navigable in fact" language for determining admiralty jurisdiction in the Third Circuit, though *The Daniel Ball*'s holdings remain modified in their application under the Commerce Clause by *Appalachian Power Co. See also Reeves v. Mobile Dredging Pumping Co., Inc.,* 26 F.3d 1247, 1253 (3rd Cir.1994) (citing *The Daniel Ball,* finding a man-made, land-locked lake entirely within Pennsylvania's borders non-navigable, because "A body of water is navigable for purposes of federal admiralty jurisdiction if it is one that, by itself or by uniting with other waterways, forms a continuous highway capable of sustaining interstate or foreign commerce."); *Marroni v. Matey,* 492 F.Supp. 340, 342 (1980) (applying *Stoeco,* finding a section of the Delaware River non-navigable because at the point in question the river was not actually navigable or reasonably susceptible to use for navigation, without modifications).

■ In sum, we believe the appropriate standard for determining the navigability of a body of water for the purpose of conferring admiralty jurisdiction in the Third Circuit is whether the body of water is actually navigable or susceptible to being navigated without modification from its current state.

As the Supreme Court explained in *The Belfast,* "[T]he judicial power, which, among other things, extends to all cases of admiralty and maritime jurisdiction, was conferred upon the Federal government by the Constitution, and Congress cannot enlarge it, not even to suit the wants of commerce, nor for the more convenient execution of its commercial regulations." *The Belfast,* 74 U.S. at 641, 7 Wall. 624. Or, more simply put, "The powers of Congress to legislate are greater than the powers of the Federal courts to adjudicate." *Doran v. Lee,* 287 F.Supp. 807, 811 (W.D.Pa.1968), cited in *Oseredzuk,* 354 F.Supp. at 456.

III. Navigability of the Susquehanna Between the Safe Harbor and Holtwood Dams

Plaintiff Fahnestock distinguishes the facts of *Kaiser Aetna, Oseredzuk, Reeves* and others on the grounds that those decisions concerned land-locked and/or man-made lakes, not "the mighty Susquehanna River," which was historically navigable. Fahnestock Brief at p. 9. Though we have rejected the Commerce Clause "historic navigability" test in the context of determining admiralty jurisdiction, we believe it is worth examining cases discussing bodies of water more akin to the Susquehanna between the Safe Harbor and Holtwood dams. Since we find none within our Circuit, we broaden our investigation to other areas.

The case of *Adams v. Montana Power Co.,* 528 F.2d 437 (9th Cir.1975) is very much like ours. In *Adams,* the decedent was drowned riding in a small boat on a segment of the Missouri River "twenty-five miles long, wholly in Montana, and completely obstructed by Hauser dam at one end and by Holter dam at the other." *Id.* at 439. The court held that although "the portion of the Missouri River in question was navigable in its natural and unobstructed condition," and therefore navigable for assuring congressional jurisdiction under the Commerce Clause, the dammed-in portion of the Missouri was not navigable for the purpose of conferring admiralty jurisdiction upon the court. *Id.* at 440–441. The Ninth Circuit explained:

The damming of a previously navigable waterway by a state cannot divest Congress of its control over a potentially useful artery of commerce, since such

obstructions may always be removed. Hence the courts have reasonably held that a navigable river is not rendered non-navigable by artificial obstruction.

However, if the damming of a waterway has the practical effect of eliminating commercial maritime activity, no federal interest is served by the exercise of admiralty jurisdiction over the events transpiring on that body of water, whether or not it was originally navigable. No purpose is served by application of a uniform body of federal law, on waters devoid of trade and commerce, to regulate the activities and resolve the disputes of pleasure boaters. Only the burdening of federal courts and the frustrating of the purposes of state tort law would be thereby served. *Id.*

We adopt the *Adams* court's cogent reasoning, which has been widely followed in situations like the one operating in the instant case. *See* Baughman, 90 Mich. L.Rev. at 1050 (discussing navigability in the admiralty context in the "case of dams built across previously navigable rivers," observing that "Most courts faced with the issue have followed the *Adams* reasoning and held that when a waterway loses the capacity to support commercial traffic it ceases to be navigable for admiralty purposes. The two cases holding otherwise appear to have been overruled.").

More recently, the Second Circuit found a section of the Hudson River non-navigable because it was separated from the navigable portion of that waterway by "numerous impassable rapids, falls, and artificial dams." *LeBlanc v. Cleveland*, 198 F.3d 353, 357 (2nd Cir.1999). The court observed that *The Daniel Ball* contained the traditional test of admiralty jurisdiction, and held:

> [N]othing in *The Daniel Ball* indicates that an historically navigable river remains navigable for admiralty jurisdiction purposes when it is made impassa-

ble by an artificial obstruction.... [W]e hold that a waterway at the situs in issue is navigable for jurisdictional purposes if it is presently used, or is presently capable of being used, as an interstate highway for commercial trade or travel in the customary modes of travel on water. Natural and artificial obstructions that effectively prohibit such commerce defeat admiralty jurisdiction. *Id.* at 357, 359.

■ Following *Adams* and *LeBlanc*, *inter alia,* we find no justification for extending our jurisdiction to a pleasure boating accident in a dammed, intra-state portion of the Susquehanna, however "mighty" it may once have been, and however navigable the river may continue to be at other points along its length.

### *CONCLUSION*

Granting counter-claim defendant Lints' motion to reconsider, we vacate our previous orders in this case, holding that the Susquehanna River is not navigable between the Safe Harbor and Holtwood dams for the purpose of conferring admiralty jurisdiction, inasmuch as navigability in admiralty implies a waterway's actual navigability or its susceptibility to being navigated without modification from its current state. However, the river remains forever navigable for purposes of congressional authority under the Commerce Clause. Lacking subject matter jurisdiction, we dismiss this case.

An order consistent with this opinion follows.

### *ORDER*

AND NOW, this 5th day of April, 2002, consistent with the foregoing Opinion it is hereby ORDERED that:

1. Plaintiff (Counter Claim Defendant) Thomas Lints' Motion for Reconsideration of Memorandum and Order Denying Motion to Dismiss for Lack

of Subject Matter Jurisdiction, filed February 8, 2002, is **GRANTED.**

2. Our Memorandum and Order in this case, decided January 28, 2002, is **VACATED** and **WITHDRAWN**.

3. Our Opinion and Order in this case, decided October 3, 2001 and published as *Smith v. Haggerty*, 169 F.Supp.2d 376 (E.D.Pa.2001), is **VACATED** and **WITHDRAWN**.

4. The Susquehanna River between Safe Harbor and Holtwood dams is **DECLARED** not navigable for the purpose of conferring admiralty jurisdiction upon the federal judiciary, though it remains subject to congressional authority under the Commerce Clause.

5. This case is **DISMISSED** for lack of subject matter jurisdiction, under Fed.R.Civ.P. 12(b)(1), because we find no admiralty jurisdiction and no other basis for our jurisdiction. Our dismissal is without prejudice to Plaintiffs' state rights to refile under the Pennsylvania saving clause, 42 Pa.Cons. Stat.Ann. § 5535 (1981).